IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) Case No. |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HEALTH CARE SERVICE CORPORATION, | ) |
| d/b/a BLUE CROSS BLUE SHIELD OF | ) |
| ILLINOIS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

Plaintiff, JOHN DOE, herein sets forth the allegations of his Complaint against Defendant HEALTH CARE SERVICE CORPORATION, d/b/a BLUE CROSS BLUE SHIELD OF ILLINOIS:

## JURISDICTION

1. This action is brought under 29 U.S.C. §§ 1132(a), (e), (f) and (g) of the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") as it involves a claim by Plaintiff relating to benefits under an employee benefit plan regulated and governed by ERISA. Jurisdiction is predicated under these code sections as well as 28 U.S.C. § 1331 as this action involves a federal question. This action is brought for the purpose of obtaining benefits under the terms of an employee benefit plan, enforcing Plaintiff's rights under the terms of an employee benefit plan, and to clarify Plaintiff's rights to future benefits under the employee benefit plan. Plaintiff seeks relief, including but not limited to: payment of benefits, prejudgment and post-judgment interest, and attorneys' fees and costs.

## THE PARTIES

2.  Plaintiff, John Doe[1], is and was at all relevant times a resident of Emington, Illinois.

3.  Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois ("Blue Cross") is a corporation with its principal place of business in the State of Illinois, authorized to transact and transacting business in this judicial district, the Northern District of Illinois, and can be found in the Northern District of Illinois. Thus, venue is proper in this judicial district pursuant to 29 U.S.C. § 1132(e)(2).

4.  Blue Cross is the insurer and claims administrator of the employee welfare benefit plan (the "Plan") pursuant to which Plaintiff's toddler daughter, K.H., is entitled to health benefits.

## FIRST CAUSE OF ACTION

## FOR DENIAL OF PLAN BENEFITS UNDER ERISA

5.  Plaintiff files this action to recover benefits for durable medical equipment, *i.e.* a safety bed, for his toddler daughter K.H.

6.  The Plan provides benefits for durable medical equipment that is primarily and customarily used to serve medical purposes.

### K.H.'s Medical History

7.  In February 2023, Plaintiff's daughter, K.H., was 24 months old when she was seen by a pediatric specialist who confirmed the diagnoses of autism spectrum disorder at level two to level three (moderate to intense assistance required), receptive-expression language delay,

---

[1] Plaintiff proceeds under a pseudonym to protect the confidentiality of Plaintiff's toddler daughter pursuant to Federal Rule of Civil Procedure 5.2 which requires that minors are only identified by their initials in pleadings.

developmental delay, and Pica, a mental health condition where a person compulsively swallows non-food items. She had behaviors of head banging and other self-injurious behavior and elopement.

8. As a baby, K.H. did not respond to her own name, babble, crawl, walk, or meet many other developmental milestones.

9. K.H. climbed out of her crib and hurt herself on several occasions. She had no sense of fear or self-preservation.

10. K.H. chewed on the wooden rail of her crib. Wood was a regular texture of choice for her chewing. She chewed splinters and chunks off wood. When her parents wrapped her wood crib rail with duct tape, K.H. chewed the tape off and resumed chewing the crib rail.

11. K.H. weighed 45 pounds at age 2, far exceeding the average size of a 2 year old.

<u>Plaintiff's Attempts to Obtain a Safety Bed from Blue Cross In-Network Providers</u>

12. K.H.'s pediatricians and healthcare providers, including early childhood specialists recommended that a safety bed for K.H.'s safety.

13. Plaintiff and his wife sought to obtain a safety bed for K.H.

14. Safety beds are designed to prevent choking hazards, wandering danger, significantly lower the ability to self-injure, and remove the necessity of K.H. being mentally able to understand our directions to be safe.

15. Due to K.H.'s size, the "Cubby bed" was considered the only option.

16. Plaintiff contacted the only two durable medical equipment ("DME") providers in the Blue Cross network within 60 miles of Plaintiff's residence: Numotion and National Seating and Mobility.

17. National Seating and Mobility informed Plaintiff's wife that they could not fulfill the request for the Cubby bed due to "capacity reasons."

18. Numotion provided a statement showing the contracted cost to Blue Cross for the Cubby bed was $13,490.00.

19. Numotion reported to Plaintiff that it submitted a preauthorization request to Blue Cross for the Cubby bed.

20. Blue Cross reported to Plaintiff that it did not receive a preauthorization request from Numotion for the Cubby bed.

21. Plaintiff again inquired with Numotion who refused to proceed with the order for the Cubby bed without a response from Blue Cross.

22. Numotion ultimately refused to provide a self-pay quote to Plaintiff while the preauthorization request was pending with Blue Cross.

23. After two months of attempts to obtain an order through an in-network provider, Plaintiff and his wife purchased a Cubby bed directly from the manufacturer at the cost of $8,613.00.

24. Plaintiff and his wife obtained a loan to pay for the cost of the Cubby bed.

Blue Cross Denied Benefits for a Safety Bed

25. In an Explanation of Benefits ("EOB") with a processed dated of March 27, 2023, Blue Cross denied Plaintiff's request for benefits for the Cubby bed in the amount of $8,613.00. The EOB provide footnotes stating that the expense is not covered under the terms of the Plan, the amount billed is more than what is allowed for this service, and the provider is out-of-network.

26. In an Explanation of Benefits ("EOB") with a processed dated of April 13, 2023, Blue Cross again denied Plaintiff's request for benefits for the Cubby bed in the amount of $8,613.00 with a footnote stating that the Plan does not provide benefits for durable medical equipment.

Plaintiff's Appeal to Blue Cross

27. On June 23, 2023, Plaintiff and his wife submitted an appeal requesting that Blue Cross reverse the denial and reimburse them for the Cubby bed in the amount of $8,613.00.

28. Plaintiff provided an appeal letter with photos describing K.H.'s condition, explained the dangers posed by K.H.'s crib, explained attempts to obtain DME from an in-network provider, and explained how the safety bed served a medical purpose.

29. Plaintiff's appeal also included letters of support from healthcare providers:

   a. Prescription for a safety bed by Prudence Hartwell, MD, Developmental Behavioral Pediatrics, who diagnosed K.H. with autism, Pica, receptive-expressive language delay, and developmental delay;

   b. Letter of medical necessity from Dr. Prudence Hartwell;

   c. Letter of medical necessity from Megan Brown, Certified Nurse Practitioner, at K.H.'s pediatrician office;

   d. Letter of medical necessity from K.H.'s Developmental Therapist, Jennifer Trimble, DT, certified Early Intervention Specialist;

   e. Letter of medical necessity from K.H.'s Occupational therapist, Melanie Tindle MOTR/L, certified Early Intervention Specialist; and

   f. Letter of medical necessity from K.H.'s speech therapist, Paula Hamilton MS CCC SLP, certified Early Intervention Specialist.

30. The providers unanimously recommended a safety bed for K.H. for medical and safety reasons:

    a. "This letter is a letter of medical necessity requesting that a safety bed (such as a Cubby Bed) be covered by her insurance for medical and safety reasons." – Dr. Prudence Hartwell

    b. "[K.H.] is in need of the Cubby Safety Bed due to her weight and head banging." – Megan Brown

    c. "Due to [K.H.'s] behaviors in & out of bed, she cannot be unsupervised for any amount of time. The requested bed will provide a controlled environment that supports healthy behaviors to improve [K.H.'s] sleep hygiene and safety. Due to her unpredictable behaviors. she is an elopement risk. . . When the environment is controlled, [K.H.] will be afforded to opportunity to sleep, directly impacting her ability to positively function and participate in therapy and other daily activities, while decreasing her chance of self-injurious behaviors." – Melanie Tindle

    d. "[K.H.] is too young to be expected to seek out appropriate, safe sensory input activities on her own when she wakes during the night. In addition, it is not realistically possible for one of her parents to be physically present and alert throughout the night in order to help her safely seek out regulation if she does wakes up. As a result, sleep is, without a doubt, the most challenging daily routine we have been trying to address. When [K.H.] is not well regulated, she engages in extensive sensory seeking behaviors that provide her with additional vestibular, proprioceptive, oral,

6

and tactile sensory input. She paces the perimeter of her whatever space she is in at the time. She engages in climbing behavior, seeking higher vantage points, often getting herself into unsafe situations." – Jennifer Trimble

### Blue Cross Denied Plaintiff's Appeal

31. In a letter dated August 18, 2023, Blue Cross partially approved three parts of Plaintiff's claim but stated that these parts of the claim would be processed as an out-of-network benefit. Blue Cross did not address Plaintiff's futile attempts to utilize an in-network provider. Blue Cross wrote that a fourth part of Plaintiff's claim would be reviewed separately.

32. In a letter dated August 23, 2023, Blue Cross retracted its prior determination and wrote that the "services" were not medically necessary. Blue Cross did not explain its decision. Blue Cross did not cite or reference any Blue Cross medical policy. Blue Cross did not address the reasons in Plaintiff's appeal and did not address or refute the letters of medical necessity from K.H.'s healthcare providers. Blue Cross wrote that Plaintiff had one internal appeal and his appeal rights were now exhausted. Blue Cross wrote that a separate letter would be sent with an explanation for the denial, but no such letter was received by Plaintiff.

### Plaintiff Filed a Complaint with the Illinois Department of Insurance

33. In October 2023, Plaintiff filed a Complaint with the Illinois Department of Insurance regarding Blue Cross's denial of benefits.

34. In a letter dated November 29, 2023, Blue Cross wrote to the Illinois Division of Insurance regarding Plaintiff's Complaint. Blue Cross wrote: "Since the claim was denied as not medically necessary, the member have [sic] appeal rights for a clinical review. Once the appeal rights are exhausted, the member may request an independent external review."

35. In a letter dated December 6, 2023, Blue Cross again denied Plaintiff's claim in a short letter of a few sentences. Blue Cross wrote that the Cubby bed and accessories "are considered comfort or convenience items and therefore not medically necessary per health care corporation and Blue Cross Blue Shield of Illinois medical policy." Blue Cross did not provide further explanation. Blue Cross did not cite or reference the Blue Cross medical policy in any previous denial.

36. In a letter dated January 17, 2024, Blue Cross again wrote to the Illinois Division of Insurance regarding Plaintiff's Complaint. Blue Cross wrote: "It was determined the Cubby Bed is considered a comfort or convenience item and therefore not medically necessary. A letter outlining the medical necessity denial was sent to the member on 12/06/2023." Blue Cross wrote that Plaintiff was eligible for an internal clinical appeal within 180 days from the December 6, 2023 denial.

37. In a letter dated February 2, 2024, the Illinois Department of Insurance wrote to Plaintiff that his Complaint was still under review with the office.

38. In a letter dated April 16, 2024, Blue Cross wrote to Plaintiff a brief letter which only stated: "All appeal rights for the above listed claim have been exhausted. Any further consideration will need to be submitted through a Request for Review by an Independent Review Organization."

<u>Plaintiff Submitted a Request for an External Review</u>

39. On June 28, 2024, Plaintiff and his wife submitted a request for an external review requesting reversal of the denial and payment of the claim at the in-network rate. The request included a letter explaining the medical need for the safety bed, the attempts to obtain

8

DME from an in-network provider, and Illinois state law regarding network adequacy and transparency.

    40.    Plaintiff wrote that K.H.'s safety bed serves a medical purpose:

> [T]he medical purpose was overall safety. Due to PICA, which is the eating of non-food items, we could no longer use a wooden crib, as she was chewing chunks from the wood until it splintered. This resulted in a choking hazard. Additionally, due to her autism, she has a tendency to wander, coupled with the developmental delay and lack of understanding when communicated to, she was at risk for chewing on various items despite appropriate baby proofing when she would get out and climbing to escape the crib. With a bedroom situated at the top of the stairs, she was at serious risk in her old sleeping arrangement, not only from dangers around the room, but also hazards from attempted escape and tumbling down the stairs. We had several instances of her removing the tight fitting crib sheet and getting herself caught between the sheet and the mattress previously. Due to a lack of effective communication (despite the efforts of speech therapy) meltdowns are frequent and can include self-injurious behavior such as head banging. Now, within the confines of her bed, there is far less concern for her safety.

    41.    Plaintiff wrote that the Cubby bed was recommended by K.H.'s healthcare providers out of medical necessity, not as a comfort item. Plaintiff again provided letters of medical necessity from K.H.'s healthcare providers.

    42.    Plaintiff explained how they met each factor for medical necessity in the Plan:

> Not only did the provided letters confirm the diagnosis and ongoing treatment for my daughter, but collectively supports every applicable bullet outlined in your coverage policy requirements. Per your own outlined definition, this safety bed meets all the requirements qualifying it as a medically necessary safety item for a developmentally delayed autistic toddler with PICA, self-injurious behavior, receptive-expressive language delay, and elopement tendencies.
> Given all this information, and due to the long-distance range to the in-network provider options, laws in place for medical care provided to children with autism, and the medical necessity, I implore you to

reconsider the denial of this claim and expedite reprocessing for immediate reimbursement at the In Network level of care.

43. Plaintiff wrote that there were only two in-network providers within 60 miles of Plaintiff's residence. Plaintiff wrote that these two in-network providers: "delayed response and follow through and both providers failed to submit the required paperwork to BCBS. In trying to work with in-network providers, it delayed getting my daughter the bed by over two months and without any progress being made."

44. Plaintiff wrote that the State of Illinois Network Adequacy and Transparency Act requires that Blue Cross provide services at no greater cost than an in-network provider because Blue Cross did not have an available in-network provider within 60 miles of Plaintiff's residence.

45. Plaintiff described the frustration of attempting to obtain approval from Blue Cross:

> They will not pay in network because we went out of network, though we had no choice because neither option would help us. Even though the two in network providers do not meet Illinois requirement, we still tried to use them and they refused us. Thus has been the trend, having no assistance whatsoever and no one on our side. Inaccurate information is regularly provided, the reasons change all the time, no one can tell me why, no one can prove BCBS did what they were supposed to do to adhere to the federal and state mandates. I can't even obtain call records from them that I have been requesting since November to provide to you with this appeal. No one, absolutely no one is holding them accountable.

Blue Cross Refused to Consider Plaintiff's Request for an External Review

46. In letters dated July 5, 2024 and July 19, 2024, Blue Cross wrote that Plaintiff's claim was not eligible for an external review because the denial was *not* based on medical necessity (i.e. "not medically necessary").

47. Blue Cross did not address its four prior letters to Plaintiff – dated August 23, 2023, November 29, 2023, December 6, 2023, January 17, 2024 – which all confirmed that its denial was based on Blue Cross's determination that the Cubby bed was not medically necessary.

48. Blue Cross did not address its prior letter dated April 16, 2024, in which Blue Cross wrote that Plaintiff had exhausted appeals and was entitled to an external review.

<u>Blue Cross Requested the Return of Partial Payment</u>

49. Blue Cross provided a check to Plaintiff on December 6, 2023 for partial payment of the claim in the amount of $2,153.25.

50. In letters dated January 13, 2024 and March 13, 2024, Blue Cross requested that Plaintiff return this "overpayment."

51. Plaintiff has not returned any monies paid on the claims to Blue Cross.

52. Defendant wrongfully denied Plaintiff's claim for benefits, in the following respects, among others:

    (a) Failure to authorize and pay for DME as required by the Plan at a time when Defendant knew Plaintiff was entitled to such benefits under the terms of the Plan;

    (b) Failure to provide prompt and reasonable explanations of the bases relied on under the terms of the Plan, in relation to the applicable facts and plan provisions, for the denial of Plaintiff's request for DME;

    (c) After Plaintiff's requests for DME were denied in whole or in part, failure to adequately describe to Plaintiff any additional material or information necessary to perfect his requests along with an explanation of why such material is or was necessary;

  (d) Failure to properly and adequately investigate the merits of Plaintiff's requests for DME and/or provide alternative DME that would be approved;

  (e) Failure to provide Plaintiff with a full and fair review pursuant to 29 C.F.R.§ 2560.501-1(h)(3)(iii) by failing to consult with health care professionals who have appropriate training and experience in the field of medicine involved in the medical judgment;

  (f) Failure to correctly, consistently, and timely inform Plaintiff of his appeal rights; and

  (g) Failure to consider Plaintiff's request for an external review.

  53. Plaintiff is informed and believes and thereon alleges that Defendant wrongfully denied Plaintiff's request for DME by other acts or omissions of which Plaintiff is presently unaware, but which may be discovered in this future litigation and which Plaintiff will immediately make Defendant aware of once said acts or omissions are discovered by Plaintiff.

  54. Following the denial of benefits under the Plan, Plaintiff exhausted all administrative remedies required under ERISA and performed all duties and obligations on his part to be performed.

  55. As a proximate result of the denial of benefits, Plaintiff has been damaged in the amount of $8,613.00 plus interest, with the total sum to be proven at the time of trial.

  56. As a further direct and proximate result of this improper determination regarding his request for DME, Plaintiff, in pursuing this action, has been required to incur attorneys' costs and fees. Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is entitled to have such fees and costs paid by Defendant.

57. Due to the wrongful conduct of Defendant, Plaintiff is entitled to enforce his rights under the terms of the Plan and to clarify his rights to future benefits under the terms of the Plan.

## SECOND CAUSE OF ACTION

## FOR EQUITABLE RELIEF

58. Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

59. As a direct and proximate result of the failure of the Defendant to pay DME benefits, and the resulting damages sustained by Plaintiff as alleged herein, Plaintiff requests that this Court grant Plaintiff the following relief pursuant to 29 U.S.C. § 1132(a)(1)(B):

    (a) Restitution of all past benefits due to Plaintiff, plus prejudgment and post-judgment interest at the lawful rate; and

    (b) Such other and further relief as the Court deems necessary and proper to protect the interests of Plaintiff under the Plan.

## REQUEST FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendant as follows:

1. Payment of the cost of DME due to Plaintiff under the Plan;

2. Pursuant to 29 U.S.C. § 1132(g), payment of all costs and attorneys' fees incurred in pursuing this action;

3. Payment of prejudgment and post judgment interest as allowed for under ERISA; and

4. For such other and further relief as the Court deems just and proper.

Dated: September 4, 2024                            Respectfully submitted,

/s/ Mark D. DeBofsky

_____

Mark D. DeBofsky
One of the Attorneys for Plaintiff
John Doe

Mark D. DeBofsky
DeBofsky Law, Ltd.
2 N. Riverside Plaza, Suite 1420
Chicago, Illinois 60606
Telephone: (312) 561-4040
Fax: (312) 600-4426
Email: mdebofsky@debofsky.com

Elizabeth K. Green (CA State Bar No. 199634), seeking admission *pro hac vice*
Green Health Law, APC
201 N. Brand Blvd., Suite 200
Glendale, CA 91203
Telephone: (818) 722-1164
E-mail: egreen@greenhealthlaw.com